<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| KENNETH SILVERMAN, : <br> : <br> Plaintiff, : <br> : <br> v. : <br> : <br> ANTHONY VERRELLI and UNITED : <br> BROTHERHOOD OF CARPENTERS AND : <br> JOINERS OF AMERICA, NORTHEAST : <br> REGIONAL COUNCIL OF CARPENTERS, : <br> : <br> Defendants. | Civil Action No. 11-6576 (SRC) <br><br> OPINION |

<u>**CHESLER**</u>, District Judge

     This matter comes before the Court on the motion by Plaintiff Kenneth Silverman to remand this action to the Superior Court of New Jersey [docket entry 4]. Defendants Anthony Verrelli and United Brotherhood of Carpenters and Joiners of America, Northeast Regional Council of Carpenters have opposed the motion. The Court has opted to rule on the motion without oral argument, pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, the Court finds that it has jurisdiction pursuant to 28 U.S.C. § 1331 and will therefore deny the motion to remand.

**I.    BACKGROUND**

     Plaintiff Kenneth Silverman ("Plaintiff" or "Silverman") is the president and chief executive officer of The Silverman Group, an organization consisting of private companies

1

engaged in the business of developing real estate.  The Silverman Group is located on Morris Turnpike, in Short Hills, New Jersey in a commercial office building housing many tenants.  The Silverman Group is involved in a project to develop the premises at 128 Columbia Turnpike, in Florham Park, New Jersey, a property owned by 128 Columbia Turnpike, LLC.  The Court will refer to this real estate project as the "Columbia Turnpike Project."  According to the Complaint, the owner of the premises at 128 Columbia Turnpike entered into a contract with MD Retail Management Group, Inc. ("MD Retail"), a company which bid on the renovation work to be performed on the Columbia Turnpike Project.  MD Retail is a non-union employer.  Defendant United Brotherhood of Carpenters and Joiners of America, Northeast Regional Council of Carpenters is a building trade union, and Defendant Anthony Verelli its president.  The Court will refer to Defendants collectively as the "Union."

       The Union is engaged in a labor dispute with MD Retail because, according to the Union, MD Retail "does not meet area labor standards – they do not pay the area standard wages to all their employees on all jobs, including fully paying health benefits and pension." (Compl., Ex. A.)  The Union informed Silverman of this dispute by letter dated September 20, 2011.  In the letter, the Union warned that its public information campaign against MD Retail would involve banner displays and handbill distribution at various locations, including the premises of developers and others involved in projects employing MD Retail.  The letter further makes clear that the Union wanted Silverman "to use [his] managerial discretion to not allow MD Retail . . . to perform any work on any of [his] projects unless and until they generally meet area labor standards for all their carpentry craft work."  (Id.)

According to the Complaint, on or about September 27, 2011, the Union began displaying a banner in front of the Short Hills, New Jersey premises where The Silverman Group is located. The banner, which is approximately 24 feet long and three feet high, states in large and bold lettering: "SHAME ON THE SILVERMAN GROUP."  (Compl., ¶ 22 & Ex. D.)  Those words appear in the center, with the statement "LABOR DISPUTE" set forth on either side in smaller print.  (Id.)  The Complaint further alleges that the Union also distributed a handbill in the heavily trafficked retail corridor along Morris Turnpike in the vicinity of The Silverman Group's office building.  The handbill prominently states "SHAME ON THE SILVERMAN GROUP For Desecration of the American Way of Life" and depicts the image of a rat chewing on the American flag.  (Id., ¶ 29 & Ex. E.)  The handbill goes on to explain that a "rat is a contractor that does not pay all of its employees on all jobs area standard wages" and accuses The Silverman Group of supporting payment of substandard wages by using MD Retail to perform work on the Columbia Turnpike Project. (Id.)  It urges, in all-caps and bold printing as follows:

> **PLEASE CALL KENNETH SILVERMAN CEO & PRESIDENT OF THE SILVERMAN GROUP AT 973-765-0100 AND TELL HIM THAT YOU WANT HIM TO DO ALL HE CAN TO CHANGE THIS SITUATION AND SEE THAT AREA LABOR STANDARDS ARE MET FOR CONSTRUCTION WORK ON PRODUCTS THEY ARE INVOLVED IN.**

(Id.)

Plaintiff alleges that the banner and handbill are untruthful, misleading and defamatory because The Silverman Group is not involved in a labor dispute with the Union.  Moreover, Plaintiff takes issue with the information communicated in the handbill because, according to the Complaint, neither Silverman nor The Silverman Group have a contract with MD Retail, and

3

they have no control over whether MD Retail complies with compensation standards. He further alleges that the publication of Silverman's name and phone number along with such allegedly false accusations demeans his reputation in the community. Finally, Plaintiff complains that the handbilling and bannering activity of the Union is inappropriate because it is occurring at or near the premises of The Silverman Group's offices, which is miles away from the site of the Columbia Turnpike Project, where MD Retail – the alleged violator of area standards – is actually performing work.

Based on these factual allegations, Silverman filed a Complaint in the Superior Court of New Jersey, Law Division, Morris County on or about October 11, 2011. Defendants ask that the Court take judicial notice, pursuant to Federal Rule of Evidence § 201, of other public filings. In particular, Defendants note that on or about October 3, 2011, Columbia Turnpike LLC and The Silverman Group filed an unfair labor practice charge against with Union with the National Labor Relations Board ("NLRB") and that on or about October 4, 2011, the Union filed an unfair labor practice charge against The Silverman Group with the NLRB.

The civil action filed in state court by Silverman, the individual, pleads for relief under three common law legal theories: defamation, false light and invasion of privacy. Defendants removed the action on the grounds that the nature of the Complaint requires that it be construed to assert a federal cause of action. Plaintiff thereafter filed the instant motion to remand. The Court will proceed to analyze whether it does in fact have federal subject matter jurisdiction over this action.

## II.    DISCUSSION

### A.    Standard of Review

Defendants removed this case to federal court pursuant to 28 U.S.C. § 1441, which provides for removal of actions over which the district court has original jurisdiction. Federal district courts have limited jurisdiction, possessing "only that power authorized by Constitution and statute." Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005). In an action removed to federal court under 28 U.S.C. § 1441, the removing party bears the burden of demonstrating that there is federal subject matter jurisdiction over the action. Samuel-Bassett v. KIA Motors Am., Inc., 357 F.3d 392, 396 (3d Cir. 2004); Boyer v. Snap-On Tools Corp., 913 F.2d 108, 111 (3d Cir. 1990). Section 1441 must be strictly construed against removal, with all doubts to be resolved in favor of remand. Batoff v. State Farm Ins. Co., 977 F.2d 848, 851 (3d Cir. 1992). Federal statutory law mandates that "if at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(d).

Subject matter jurisdiction here, according to Defendants, is based on the existence of a federal question, a source of federal jurisdiction conferred by Congress on district courts by 28 U.S.C. § 1331. Section 1331 provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. "The presence or absence of federal question is governed by the well-pleaded complaint rule, which provides that federal question jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded Complaint." Caterpillar Inc. v. Williams, 482 U.S. 386, 392 (1987). Typically, then, federal question jurisdiction will lie only if the

complaint pleads a federal cause of action. Merrell Dow Pharm. Inc. v. Thompson, 478 U.S. 804, 808 (1986); Louisville & Nashville Railroad v. Mottley, 211 U.S. 149 (1918). The well-pleaded complaint rule limits the jurisdictional inquiry to the claims and theories asserted in the complaint, and absent a federal question of the face of the complaint, jurisdiction will not lie even if a defense to the state law claims relies on federal law. Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 12 (2003) (citing Franchise Tax Bd. of Cal. v. Constr. Laborers Trust for S. Cal., 463 U.S. 1, 12 (1983)). Indeed, it is "settled law that a case may *not* be removed to federal court on the basis of a federal defense, including the defense of preemption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue." Caterpillar, 482 U.S. at 393 (citing Franchise Tax Bd., 463 U.S. at 12) (emphasis in original). In other words, "pre-emption requires a state court to *dismiss* a particular claim that is filed under state law, but it does not, as a general matter, provide grounds for *removal*." Beneficial Nat'l Bank, 539 U.S. at 12 (emphasis in original).

Of course, the Complaint in this action asserts only state law causes of action. Under the well-pleaded complaint rule, the Court would properly conclude that no federal question jurisdiction exists. Defendants, however, argue that removal of this action is supported by the "complete preemption doctrine," a corollary to the well-pleaded complaint rule, which will be discussed in further detail below. They maintain that Plaintiff's claims fall within the purview of Section 303 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 187, a statute which they argue triggers the application of the "complete preemption doctrine." Thus, Defendants take the position that because Plaintiff's claims are completely preempted by federal law, Plaintiff cannot through artful pleading assert only state law claims to avoid the federal

6

question and defeat removal.

To evaluate Defendants' complete preemption argument, the Court first reviews the scope of LMRA § 303. Section 303 creates a private cause of action that may be brought by any person injured in his business or property as a result of a labor union's unfair labor practices as defined by National Labor Relations Act ("NLRA") § 8(b)(4). 29 U.S.C. § 187. NLRA § 8(b)(4), in turn, identifies various activities that constitute an unlawful "secondary boycott." It specifically prohibits, insofar as it relates to the allegations in this suit, a labor union from threatening, coercing, or restraining a person engaged in commerce or in an industry affecting commerce with the object of forcing that person to cease doing business with another. 29 U.S.C. § 158(b)(4)(ii)(B); see also NLRB v. Retail Store Emp. Union, Local 1001, 447 U.S. 607, 611-12 (1980). This conduct is known as an unlawful "secondary boycott" because it is not aimed at the employer of the subject union's members, i.e., the primary employer, but rather at a secondary employer. The statute seeks to prevent secondary boycotts which are used "to persuade the customers of the secondary employer to cease trading with him in order to force him to cease dealing with, or to put pressure upon, the primary employer." Retail Store Emp. Union, 447 U.S. at 612.

Plaintiff argues that his claims do not fall within the ambit of these statutes because his claims for defamation, false light and invasion of privacy are not based on the illegality Defendants' labor union activity, i.e., their bannering and handbilling, but rather take issue with the content of those communications. Those communications, Plaintiff further argues, are aimed at tarnishing his personal reputation, separate and apart from his company's, and invading his privacy, particularly as the handbill identifies him by name and even publishes his phone

7

number. Defendants, in response, maintain that the state tort theories of recovery invoked by Plaintiff cannot mask that his dispute with the Union and its president relates to labor union activity directed at his company. According to Defendants, the Complaint itself, through its allegations and attached exhibits (which include the September 20, 2011 letter, an image of the banner and the handbill) acknowledges that The Silverman Group is a secondary employer with regard to a labor dispute. The alleged threats made by the Union, they argue, are precisely the kind of "unfair labor practice" addressed by LMRA § 303. They also argue that Plaintiff's attempt to draw a distinction between the message expressed by the Union in its labor activities and the Union's engaging in the activity itself amounts to a semantic and artificial re-casting of the nature of their claims.

      The Court finds that Plaintiff's claims, as pled, stem from the secondary boycott the Union is pursuing against The Silverman Group. The allegations concern statements made by the Union to draw attention to The Silverman Group's involvement in a project using non-union labor, arguably in an attempt to coerce The Silverman Group's CEO, Plaintiff in this case, to have his company cease doing business, directly or indirectly, with non-union MD Retail. Indeed, all of the allegedly misleading and/or defamatory statements underpinning the Complaint's claims for defamation, false light and invasion of privacy – the three causes of action under which Plaintiff pleads for relief – were made in the banner erected by the Union outside The Silverman Group's offices or in the handbill the Union distributed. The content of the handbill, moreover, makes the object of the communication explicit – call Kenneth Silverman and ask him to "change this situation" and ensure that area labor standards are met on his company's projects, a clear reference to the use of MD Retail on the Columbia Turnpike Project.

Without making any determination as to the merits of any § 303 claim Plaintiff might bring, the Court understands Plaintiff's accusations to charge, in essence, that Plaintiff was harmed by the Union's secondary boycott. The factual allegations of the Complaint fall within the purview of LMRA § 303.

Coverage of the matters complained of by a federal cause of action does not, by itself, suffice to confer federal jurisdiction where the claims pled do not arise under federal law. To reiterate an important point of law, a mere preemption defense does not give rise to subject matter jurisdiction under 28 U.S.C. § 1331. The Court must next evaluate the applicability of the complete preemption doctrine – an exception to the well-pleaded complaint rule – to actions which implicate LMRA § 303.

"The complete preemption doctrine holds that 'Congress may so completely preempt a particular area, that any civil complaint raising this select group of claims is necessarily federal in character.'" Ry. Labor Executives Ass'n v. Pittsburgh & Lake Erie R. Co., 858 F.2d 936, 939 (3d Cir. 1988) (quoting Metro. Life Ins. Co. v. Taylor, 481 U.S. 58, 63-64 (1987)). The doctrine applies where "the preemptive force of a statute is so extraordinary that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" Caterpillar, 482 U.S. at 393 (quoting Metro. Life Ins., 481 U.S. at 65). The Supreme Court has expressly recognized the applicability of the extraordinary complete preemption doctrine in only a few areas of the law: suits that in substance state a claim under LMRA § 301 for violation of a collective bargaining agreement, suits that in substance state a claim under ERISA § 502(a)(1)(B) to recover benefits owed under an employer-sponsored benefits plan, suits that assert usury claims against national banks which are exclusively

9

governed by the cause of action provided by the National Bank Act, and tort actions arising out of nuclear accidents which are subject to removal under the Price-Anderson Act.  See Beneficial Nat'l Bank, 539 U.S. at 6-7 (listing exceptions to the well-pleaded complaint rule); see also Avco Corp. v. Machinists, 390 U.S. 557 (1968) (LMRA § 301); Metro. Life Ins. Co., 481 U.S. at 65 (ERISA § 502(a)(1)).  Defendants, in support of their argument that complete preemption applies to LMRA § 303, rely primarily on two cases: the Seventh Circuit's decision in Smart v. Local 702 Int'l Bhd. of Elec. Workers, 562 F.3d 798 (7th Cir. 2009) and the Supreme Court's decision in Local 20, Teamsters, Chauffeurs and Helpers Union v. Morton, 377 U.S. 252 (1964).

     Smart, though not binding on this Court, is directly on point with the removal issue presented by the instant motion.  There, the Seventh Circuit expressly held that LMRA § 303, like the other federal cause action created by the LMRA under § 301, completely preempts state law claims against labor unions and thus supports the removability of such claims under 28 U.S.C. § 1441.  Smart, 562 F.3d at 808.  The factual allegations at issue in Smart presented a secondary boycott situation.  The plaintiff, the proprietor of a non-union company, contracted to perform electrical work in connection with the construction of a sports complex.  The defendant labor union, according to the plaintiff, threatened to shut down the project if the sports complex owner did not terminate its relationship with the plaintiff in favor of a company employing union workers.  The Smart plaintiff claimed that the defendant labor union's activities violated the Illinois Antitrust Act.  He filed his complaint in federal court.  Id. at 801.

     On appeal of the district court's order dismissing the plaintiff's claims, the Seventh Circuit sua sponte addressed the issue of subject matter jurisdiction.  Id. at 802.  Noting that the complaint asserted only state law causes of action and lacked any indication that diversity

10

jurisdiction existed, the Court of Appeals turned to the concept of complete preemption. Id. at 802-03.  Endeavoring to discern whether Congress intended § 303 to have the extraordinary preemptive power required to re-cast state claims as arising under a federal cause of action, the Smart court's analysis began with a recognition of the now well-established principle that the complete preemption doctrine applies to claims governed by LMRA § 301. Id. at 807-08.  It proceeded to observe the similarity between the jurisdictional provisions in § 301 and § 303 and noted that, indeed, § 303's provision expressly references § 301. Id. at 808.  Section 303(b) provides:

> Whoever shall be injured in his business or property by reason or any violation of subsection (a) of this section *may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title [LMRA § 301]* without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit.

29 U.S.C. § 187(b) (emphasis added).[1]  The Smart court further reasoned that apart from the statutory language itself directing that these labor law causes of action be treated similarly, § 301 and § 303 both implicate the interest of Congress in the "uniform treatment of labor-management relations."  Smart, 562 F.3d at 808.  The court observed that "both sections are part of a broad regulatory scheme that is both substantive and procedural, with a decided purpose of providing one, uniform means for the resolution of labor disputes."  Id.  The Seventh Circuit thus concluded that, as Congress had through § 303 created a means of redressing unlawful secondary boycott activity in violation of NLRA § 8(b)(4) and had indicated that this cause of action should

---

[1] Section 185, commonly known as LMRA § 301, governs suits by and against labor organizations for violation of contracts between an employer and a labor organization, i.e., a "collective bargaining agreement."  See 29 U.S.C. § 185.

be treated similarly to actions arising under § 301, LMRA § 303 "*completely* preempts state-law claims related to secondary boycott activities described in section 158(b)(4); it provides an exclusive federal cause of action for the redress of such illegal activity." Id. (emphasis in original).  Based on this analysis, the Smart court satisfied itself that the district court had federal subject matter jurisdiction and remanded the antitrust portion of the suit so that plaintiff could amend his complaint to state a § 303 claim. Id. at 808-09.

The Supreme Court's decision in Morton further supports application of the complete preemption doctrine to actions relating to unlawful secondary boycott activities.  Though Morton did not discuss jurisdictional issues, its holding concerning the preemption of the plaintiff's common law claims allowed the Court to express its views on the all-encompassing nature of LMRA § 303 in the area of secondary boycotts by a labor union.  The Morton court addressed whether a district court had authority to award damages for the plaintiff's common law claims, which were predicated on the same secondary boycott activities giving rise to his LRMA § 303 claim. Morton, 377 U.S. at 256-57.  The plaintiff argued that because he had challenged conduct that was not protected or prohibited by the federal labor law, he was free to seek relief for injuries caused by that conduct under other legal theories. Id. at 258.  In other words, the Morton plaintiff took the approach that he could simultaneously pursue both a § 303 claim and his Ohio common law claims, with the latter being essentially a gap-filler for specific areas for which the federal law provided no redress. Id.  The Supreme Court flatly rejected the plaintiff's argument. Id. at 258-260.  It held that Congress had carefully crafted § 303 to occupy the field of unlawful labor union conduct in connection with secondary boycotts and in so doing closed the field to state regulation. Id. at 258-59.  The Supreme Court interpreted the legislation as follows:

> The type of conduct to be made the subject of a private damage action was considered by Congress, and § 303(a) comprehensively and with great particularity 'describes and condemns specific union conduct directed to specific objectives.' In selecting which forms of economic pressure should be prohibited by § 303, Congress struck the 'balance . . . between the uncontrolled power of management and labor to further their respective interests' . . . by 'preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and [by] shielding unoffending employers and others from pressures in controversies not their own.'"

Morton, 377 U.S. at 258-59 (referring to labor union conduct then enumerated in LMRA § 303(a) and now, following amendment, identified in NLRA § 8(b)(4), which § 303 incorporates by reference) (internal citations omitted).  The Court then reasoned that if state law claims related to a labor union's secondary boycott activities remained viable, the balance struck by Congress regarding permissible and proscribed conduct would be upset. Id. at 259-60.  The Supreme Court concluded that the strength and coverage of § 303 demanded that any state law claim dealing with secondary boycotts must yield to federal law, even when the state law addresses conduct not expressly covered by § 303. Id. at 260.  "In short, this is an area 'of judicial decision within which the policy of the law is so dominated by the sweep of federal statutes that legal relations which they affect must be deemed governed by federal law having its sources in those statutes, rather than by local law.'"  Id. at 261 (quoting Sola Elec. Co. v. Jefferson Elec. Co., 317 U.S. 173, 176 (1942)).

      This Court has, as set forth above, already determined that the alleged wrongdoing for which Plaintiff seeks relief concerns the Union's secondary boycott activities.  Following the Seventh Circuit's holding in Smart and the Supreme Court's strong guidance in Morton, this Court holds that the state law claims asserted in Plaintiff's Complaint must be deemed to arise

under § 303.  The complete preemption doctrine applies and supports the removability of Plaintiff's Complaint based on federal question jurisdiction.

Plaintiff's motion to remand will therefore be denied.  In the interests of justice, Plaintiff will be allowed to amend his Complaint, pursuant to Federal Rule of Civil Procedure 15, to assert a claim for relief under LMRA § 303.  See Smart, 562 F.3d at 809 (directing that on remand to the district court, the plaintiff be permitted an opportunity to amend his complaint to seek relief under the governing federal statute, rather than forcing him to continue with a preempted, and therefore patently not viable claim).

### III. CONCLUSION

For the foregoing reasons, the Court has concluded that the complete preemption doctrine applies and Plaintiff's Complaint must be construed to arise under the cause of action supplied by LMRA § 303.  It will deny Plaintiff's motion to remand.  Additionally, the Court will afford Plaintiff leave to amend and will accordingly deny without prejudice Defendants' pending motion to dismiss the Complaint.  Finally, the motion filed by Plaintiff asking that this Court "stay" or hold in abeyance its decision on the motion to dismiss until it has resolved the issue of subject matter jurisdiction will be dismissed as moot.  An appropriate form of Order will be filed herewith.

   s/Stanley R. Chesler
STANLEY R. CHESLER
United States District Judge

DATED: February 7, 2012